[Cite as *Holloway v. Parker*, 2013-Ohio-1940.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

MAX HOLLOWAY,

    PETITIONER-APPELLEE,        CASE NO. 9-12-50

    v.

MELISSA PARKER,            O P I N I O N

    RESPONDENT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 12-CV-526

**Judgment Reversed**

**Date of Decision: May 13, 2013**

APPEARANCES:

    *Kevin P. Collins* **for Appellant**

    *Max Holloway,* **Appellee**

Case No. 9-12-50

**ROGERS, J.**

{¶1} Respondent-Appellant, Melissa Parker, appeals the judgment of the Court of Common Pleas of Marion County granting Petitioner-Appellee, Max Holloway, a civil stalking protection order ("CSPO") covering Max, his wife, Amy Holloway, and their three minor children. On appeal, Parker contends that Max presented insufficient evidence to support the issuance of the CSPO, and that the issuance of the CSPO was against the manifest weight of the evidence.[1] For the reasons that follow, we reverse the trial court's judgment.

{¶2} On July 31, 2012, Max filed a petition seeking a CSPO against Parker, on behalf of himself, Amy, and their three minor children. In his petition, Max alleged that "Parker has stalked me at my work place and has been told to stay away from myself and work area for 2 months. On July 30[, 2012] she left a note threatening me in my work area while I was on break which I took a picture of and then notified my supervisor." (Docket No. 1, p. 2).

{¶3} On August 7, 2012, the matter proceeded to a full hearing during which the following relevant evidence was adduced.

{¶4} Amy testified that the situation which prompted Max to file the petition began on June 26, 2012. Specifically, Amy testified that she received a phone call that day from her then-friend, Parker, who works with Max. According

---

[1] We note that Max did not file a brief with this court. As a result, we "may accept [Parker's] statement of the facts and issues as correct and reverse the judgment if [Parker's] brief reasonably appears to sustain such action." App.R. 18(C).

to Amy, Parker said that there were rumors about her and Max, but provided no details about the rumors. Amy testified that she was not sure what to make of Parker's comments, and eventually spoke with Max about her conversation with Parker.

{¶5} Amy testified that she called Parker back and inquired why she was hanging around her husband and why she would inform her of the rumors. According to Amy, Parker attempted to "backtrack" from her previous statements, and that it was her belief that Parker "was trying to make [her] angry and make [her] believe that there was something there and then try to make [her] not believe there was something between [Parker and Max] and then make [her] believe again." Hearing Tr., p. 7.

{¶6} Amy testified that she repeatedly informed Parker that she and Max did not want any further contact with her, but did not indicate when she first informed Parker of the same. Amy testified that her husband found a note on his desk at work after she requested Parker to cease contact with her and Max. The note read as follows: "You want to act like you hate me[.] I'll give you a reason – round 2 coming up." Plaintiff's Exhibit 1. Though the letter was not signed, Amy testified that she presumed Parker authored the note. Consequently, Amy again contacted Parker and asked her "what is round two, I'm ready." Hearing Tr., p. 9.

According to Amy, Parker responded "round two[,] the truth is [Max and I have] been sleeping together for two years." *Id*.

**{¶7}** On cross-examination, Amy testified that Parker has not threatened her with physical harm, but has caused her to seek counseling. Specifically, Amy explained that she has been seeing a marriage counselor due to the "stress" of the situation with Parker. Hearing Tr., p. 11. Amy further testified that she was not aware of any instances where Parker made any threats towards her children.

**{¶8}** Next, Max testified on his own behalf. Like Amy, Max testified that the situation which prompted him to file a petition for a CSPO began on June 26, 2012. Max indicated that he and Amy had been friends with Parker, until he learned that Parker was "interested [in being] more than just * * * friends." Hearing Tr., p. 15. After learning of Parker's affections, he and Amy informed Parker that they did not want any further contact with her, and that he filed a complaint against Parker at work. Parker, however, continued to pursue him. During this time, Max found a note (i.e., Plaintiff's Exhibit 1) at his work area. Max indicated that he perceived the note to be a threat and took it to his supervisor. Feeling that his efforts to distance himself and Amy from Parker were having no effect, Max filed the petition for a CSPO.

**{¶9}** On cross-examination, Max testified that he told Parker to stay away on two separate occasions. The first occasion occurred in early July 2012, and the

second occasion took place later that same month. Max testified that he had no further contact with Parker after he told her to stay away the second time.

{¶10} Also, Max was asked whether Parker made any threats towards him during the course of the situation, resulting in the following exchange:

Q:   Did [Parker] make any physical threats to you?

A:   No, no physical threats.

* * *

Q:   What verbal threats to you did [Parker] make?

A:   Did you read the evidence?

Q:   I read the letter but I just want to hear from you what threats she made to you.

A:   Well she had threatened how - - because she couldn't have me that she was gonna make sure that she ruined my marriage, she had threatened that she was gonna get her way, that round two was coming. Now, whatever round two is I am unaware, but that's what the note says.

Q:   Were there any threats of harm to you that, you know, she was threatening your physical wellbeing, were any threats like that made to you?

A:   I consider marriage a pretty sacred and important thing, being that she was also married and wanting to violate that and try to separate me from my wife I consider that a pretty important threat.

Q:   Do you understand what I mean when I'm saying a physical threat? Something that would cause you to seek some kind of medical treatment if you got a cut, a scratch, a broken arm, that's what I mean when I say a physical threat, something that would harm your physical person?

A: Right, And I answered yes, sir, that there's been no physical threat, just verbal. Hearing Tr., p. 16-18.

Max further testified that he was not aware of Parker making any threats of physical harm towards Amy or his children. Max also testified that he was not seeking any kind of mental health counseling at the time of the hearing.

{¶11} Upon the conclusion of Max's testimony, Max rested his case and the note was admitted into evidence.

{¶12} Next, Parker testified that she has known Max for approximately 17 years, that they have been friends during that time, and that they currently work for the same company. According to Parker, sometime during late June 2012, Amy told her to stay away from Max. Parker testified that she complied with Amy's request until early July 2012 when she ran into Max at Walmart. Parker explained that she attempted to talk with Max about their alleged affair, but that Max indicated that he wanted to wait "until stuff calms down." Hearing Tr., p. 23. Parker testified that her last contact with Max occurred at work on July 23, 2012. According to Parker, she told Max that she was going to inform Amy of their affair, and that Max indicated that he did not care. On cross-examination, Parker acknowledged that she left the note, identified as Plaintiff's Exhibit 1, at Max's work station on July 23, 2012. Parker explained that she wrote the note because

"[Max] kept upsetting [her] and wouldn't even talk to [her] like an adult." *Id*. at p. 28.

{¶13} Parker testified that she and Max are no longer friends, and that she believes that Max filed the petition because she told Amy that she and Max had been having an affair for two years. Parker further testified that she has never struck or otherwise threatened Max, Amy, or any of their children.

{¶14} At the conclusion of Parker's case-in-chief, the trial court found that there was sufficient evidence to issue the protection order. The trial court filed the CSPO on August 9, 2012, in which it named Max, Amy, and their children as protected persons.[2] The CSPO also indicated that it would remain in effect until August 7, 2014.

{¶15} It is from this judgment Parker filed this timely appeal, presenting the following assignments of error for our review.

---

[2] Upon thorough examination of the record, we have come across a discrepancy which we feel compelled to address. At the conclusion of the hearing, the trial court stated that it had found there to be "sufficient evidence for a Civil Stalking Protection Order to issue in this matter." Hearing Tr., p. 30. Immediately following this general finding the trial court proceeded to outline the terms of the protection order, stating the following: "Conditions of the order would be that Melissa Parker is not to abuse, threaten, harass, bother, or follow Max Holloway, [or the Holloway's children]. In addition, [Miss Parker] is not to enter the residence, school, or daycare centers or childcare centers of * * * Max Holloway, [or the Holloway's children]. In addition Miss Parker is to stay at least 150 feet away from Max Holloway, [and the Holloway's children]. Miss Parker is also not to initiate or have any contact or communication of any kind with Max Holloway, [or the Holloway's children]. And Miss Parker's [sic] not to cause or encourage any other person to do so." *Id*. Noticeably, the trial court does not name Amy as a protected person during the hearing, but does name her as a protected person in the CSPO. Further adding to the confusion of this discrepancy, are the contents of a form entitled "Protection Order Notice To NCIC", which was signed by the trial judge and filed on the same day the CSPO was filed. This form lists Max and the Holloway's children as protected persons, but does not list Amy. Given the foregoing, we believe the trial court improperly included Amy as a protected person in the CSPO. Nevertheless, we will, for purposes of this appeal, proceed as though Amy is a protected person.

*Assignment of Error No. I*

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT THE STALKING PROTECTION ORDER AS TO AMY HOLLOWAY.**

*Assignment of Error No. II*

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT THE STALKING PROTECTION ORDER AS TO MAX HOLLOWAY.**

*Assignment of Error No. III*

**THE RECORD CONTAINS INSUFFICIENT EVIDENCE TO SUPPORT THE STALKING PROTECTION ORDER AS TO THE CHILDREN.**

*Assignment of Error No. IV*

**THE STALKING PROTECTION ORDER AS TO PETITIONER, AMY HOLLOWAY, IS CONTRARY TO THE MANIFEST WEIGHT OF [sic] EVIDENCE.[3]**

*Assignment of Error No. V*

**THE STALKING PROTECTION ORDER AS TO MAX HOLLOWAY IS CONTRARY TO THE MANIFEST WEIGHT OF [sic] EVIDENCE.**

*Assignment of Error No. VI*

**THE STALKING PROTECTION ORDER AS TO THE CHILDREN IS CONTRARY TO THE MANIFEST WEIGHT OF [sic] EVIDENCE.**

---

[3] We note that Max, not Amy, is the petitioner in this matter.

{¶16} Due to the nature of Parker's assignments of error, we elect to address her first three assignments together.

*Assignments of Error Nos. I, II, & III*

{¶17} In her first, second, and third assignments of error, Parker contends that there is insufficient evidence to support the issuance of the CSPO protecting Max, Amy, and their children. We agree.

{¶18} When reviewing a trial court's decision to grant a civil protection order, we will not reverse the decision absent an abuse of discretion. *Van Vorce v. Van Vorce*, 3d Dist. No. 2-04-11, 2004-Ohio-5646, ¶ 15, citing *Kramer v. Kramer*, 3d Dist. No. 13-02-03, 2002-Ohio-4383, ¶ 11. A trial court will be found to have abused its discretion when its decision is contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *See State v. Boles*, 2d Dist. No. 23037, 2010-Ohio-278, ¶ 16-18, citing *Black's Law Dictionary* 11 (8 Ed.Rev.2004). When applying the abuse of discretion standard, a reviewing court may not simply substitute its judgment for that of the trial court. *State v. Nagle*, 11th Dist. No. 99-L-089 (June 16, 2000), citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). Further, if there is some competent, credible evidence to support the trial court's decision regarding the issuance of a CSPO, there is no

abuse of discretion. *Warnecke v. Whitaker*, 3d Dist. No. 12-11-03, 2011-Ohio-5442, ¶ 12, citing *Ross v. Ross*, 64 Ohio St.2d 203 (1980).[4]

{¶19} The issuance of a CSPO is governed by R.C. 2903.214, and provides, in relevant part, as follows:

> (C)  A person may seek relief under this section for the person, or any parent or adult household member may seek relief under this section on behalf of any other family or household member, by filing a petition with the court. The petition shall contain or state all of the following:
>
> (1)  An allegation that the respondent is eighteen years of age or older and engaged in a violation of section 2903.211 of the Revised Code against the person to be protected by the protection order * * *;

Accordingly, to be entitled to a CSPO, the petitioner must show by a preponderance of the evidence that the respondent engaged in a violation of R.C. 2903.211 against him or her. *Warnecke* at ¶ 13, citing *Kramer* at ¶ 14.  Likewise, where the petitioner seeks protection of a "family or household member" under a CSPO, the petitioner must show by a preponderance of the evidence that the respondent engaged in a violation of R.C. 2903.211 against the "family or household member" to be protected. *Retterer v. Little*, 3d Dist. No. 9-11-23, 2012-Ohio-131, ¶ 25, citing *Luikart v. Shumate*, 3d Dist. No. 9-02-69, 2003-Ohio-2130, ¶ 11 (finding that petitioner's wife and children, on whose behalf petitioner

---

[4] We note that Ohio courts are split as to the applicable standard for reviewing the issuance of a civil protection order. *See generally Abuhamda-Sliman v. Sliman*, 161 Ohio App.3d 541, 2005-Ohio-2836, ¶ 8-9 (Dist. 8th).  While this author believes that this court should examine the standard of review it applies when reviewing the issuance of a civil protection order, this author will, at this time, yield to the doctrine of stare decisis, since neither party has challenged this court's standard of review in such matters.

listed as persons to be protected under the CSPO, were improperly included as protected persons because there was no evidence that respondent knowingly engaged in a pattern of conduct against petitioner's wife and children that would cause them to believe that he would cause them physical harm or mental distress).

{¶20} Ohio's menacing by stalking statute provides, in relevant part, as follows:

> No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person.  R.C. 2903.211(A)(1).

{¶21} The culpable mental state required for menacing by stalking is "knowingly."  A person acts knowingly when, regardless of his purpose, "he is aware that his conduct will probably cause a certain result or will probably be of a certain nature."  R.C. 2901.22(B).  "A person has knowledge of circumstances when he is aware that such circumstances probably exist."  *Id.*

{¶22} A "pattern of conduct" is defined as:

> [T]wo or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents.  R.C. 2903.211(D)(1).

Accordingly, one incident is insufficient to establish a pattern of conduct.  *E.g.*, *Kramer* at ¶ 15.  In determining what constitutes a pattern of conduct for purposes of R.C. 2903.211(D)(1), the court must consider the "evidence in the context of all the circumstances of the case[,]" *Retterer*, 3d Dist. No. 9-11-23, 2012-Ohio-131, ¶

29, quoting *Middletown v. Jones*, 167 Ohio App.3d 679, 2006-Ohio-3465, ¶ 10 (12th Dist.), "even if some of the [respondent]'s actions may not, in isolation, seem particularly threatening." *Guthrie v. Long*, 10th Dist. No. 04AP-913, 2005-Ohio-1541, ¶ 12, quoting *Miller v. Francisco*, 11th Dist. No. 2002-L-097, 2003-Ohio-1978, ¶ 11, *overruled in part on other grounds*, *Davis v. DiNunzio*, 11th Dist. No. 2004-L-106, 2005-Ohio-2883.

**{¶23}** Finally, the petitioner must demonstrate that the respondent knowingly caused a protected person to believe that the respondent will cause them physical harm or mental distress. Notably, the statute is written in the disjunctive, therefore, the petitioner is only required to prove that the respondent *either* caused a protected person to believe that he or she will cause them physical harm, *or* cause a protected person to believe that he or she will cause them mental distress. *E.g.*, *Warnecke*, 2011-Ohio-5442, at ¶ 14. Accordingly, the petitioner does not have to demonstrate that he or she actually suffered physical harm or mental distress.[5] *Id.*

---

[5] While Ohio courts unanimously agree that a petitioner only has to establish that the respondent caused a protected person to believe that the respondent will cause them physical harm, courts are split as to what is necessary to establish mental distress. A majority of appellate districts, including this court, have expressly held that the petitioner need only demonstrate that the respondent, by engaging in a pattern of conduct, knowingly caused a protected person to *believe* that the respondent would cause them mental distress. *Dayton v. Davis*, 136 Ohio App.3d 26, 32 (2d Dist. 1999); *State v. Horsley*, 10th Dist. No. 05AP-350, 2006-Ohio-1208, ¶ 47; *Bloom v. Macbeth*, 5th Dist. No. 2007-COA-050, 2008-Ohio-4564, ¶ 11; *State v. Hart*, 12th Dist. No. CA2008-06-079, 2009-Ohio-997, ¶ 31; *Retterer* at ¶ 39; *Cooper v. Manta*, 11th Dist. No. 2011-L-035, 2012-Ohio-867, ¶ 33; *Ensley v. Glover*, 6th Dist. No. L-11-1026, 2012-Ohio-4487, ¶ 13; *Rufener v. Hutson*, 8th Dist. No. 97635, 2012-Ohio-5061, ¶ 13; *Griga v. DiBenedetto*, 1st Dist. No. C-120300, 2012-Ohio-6097, ¶ 13. Conversely, a minority of appellate districts have either expressly or implicitly held that the petitioner must demonstrate that the respondent, by engaging in a pattern of

**{¶24}** "Physical harm" or "physical harm to persons" is defined as, "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3). For purposes of menacing by stalking, the petitioner need not show that the respondent made an explicit or direct threat of physical harm. *Kramer*, 2002-Ohio-4383, at ¶ 15. Instead, "the test is whether the [respondent], by engaging in a pattern of conduct, knowingly caused [the protected person] to believe [he] would cause physical harm to him or her." *Id.*, citing *State v. Jones*, 12th Dist. No. CA95-12-122 (Oct. 21, 1996).

"Mental distress" is defined as either of the following:

(a) Any mental illness or condition that involves some temporary substantial incapacity;

(b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services. R.C. 2903.211(D)(2).

**{¶25}** With respect to R.C. 2903.211(D)(2)(a), "incapacity is substantial if it has a significant impact upon the victim's daily life." *Retterer* at ¶ 41, quoting *Horsley* at ¶ 48. For example, a change in the protected person's daily routine can be evidence of mental distress. *Id.*, citing *Wunsch*. However, "mere mental stress

conduct, knowingly caused a protected person *actual* mental distress. *Caban v. Ransome*, 7th Dist. No. 08 MA 36, 2009-Ohio-1034, ¶ 24; *see also Smith v. Wunsch*, 162 Ohio App.3d 21, 2005-Ohio-3498, ¶ 19 (4th Dist.); *State v. Payne*, 178 Ohio App.3d 617, 2008-Ohio-5447, ¶ 10 (9th Dist.).

or annoyance" is generally not sufficient to constitute mental distress for purposes of menacing by stalking. *Id.*, quoting *Caban* at ¶ 29.

{¶26} In establishing whether the respondent's conduct will cause a protected person to believe that the respondent will cause him or her mental distress, the petitioner need not present expert testimony. *E.g. Mullen v. Hobbs*, 1st Dist. No. C-120362, 2012-Ohio-6098, ¶ 15. Instead, the petitioner may rely on lay testimony. *Jenkins v. Jenkins*, 10th Dist. No. 06AP-652, 2007-Ohio-422, ¶ 19, citing *State v. McCoy*, 9th Dist. No. 06CA008908, 2006-Ohio-6333, ¶ 17. Further, the trier of fact may rely on its own knowledge and experience in determining whether the mental distress element has been established. *E.g.*, *Griga*, 2012-Ohio-6097, at ¶ 16.

*Max Holloway*

{¶27} Turning to the evidence presented in this matter, we find that there is insufficient evidence to establish that Parker knowingly caused Max to believe that she will cause him physical harm or mental distress. Our finding has two separate bases in the record.

{¶28} First, there is insufficient evidence that Parker knowingly caused Max to believe that she will cause him physical harm. Max repeatedly testified that Parker never expressly threatened him with physical harm. Further, there is no evidence that Max believed Parker was going to cause him physical harm.

Though Max initially testified that he perceived Parker's note to be a threat, he later explained that he viewed Parker's note as threat to his marriage, not his person.

{¶29} Second, there is also insufficient evidence that Parker knowingly caused Max to believe that she will cause him mental distress. Max testified that he was not seeking any kind of mental health counseling. Further, we are not convinced that any of the evidence presented by Max demonstrates that Parker's actions caused him to believe that she will cause him mental distress.

{¶30} Given the foregoing, we find that Max failed to present sufficient evidence to support a finding that Parker engaged in menacing by stalking against him. Accordingly, we sustain Parker's second assignment of error.

*Amy Holloway*

{¶31} We also find that there is insufficient evidence to establish that Parker engaged in a pattern of conduct that knowingly caused Amy to believe that Parker would cause her physical harm or mental distress.

{¶32} The record contains only one incident that could reasonably be viewed as evidence of conduct directed towards Amy. That incident occurred when Parker divulged the rumors concerning her and Max to Amy. After that phone call, the evidence reveals that each subsequent contact between Parker and Amy was initiated by Amy. Under the circumstances of this matter and given the

lack of any argument to the contrary, we find that any contact initiated by Amy cannot be considered in establishing a pattern of conduct. Furthermore, with the exception of Parker's phone call, the record demonstrates that Parker's actions, including the note left at Max's work station, were directed towards and concerned Max, not Amy. Given the foregoing, we find that there is insufficient evidence that Parker engaged in a pattern of conduct against Amy, and consequently must conclude that Max failed to present sufficient evidence that Parker engaged in menacing by stalking against Amy.[6]

### The Holloway's Children

{¶33} We finally find that there is insufficient evidence to establish that Parker engaged in a pattern of conduct that knowingly caused any of the Holloway's children to believe that Parker would cause them physical harm or mental distress.

{¶34} Although there was evidence that Parker was acquainted with the Holloway's children, there was absolutely no evidence that Parker engaged in a pattern of conduct against any of them, or that she knowingly caused any of them to believe that she will cause them physical harm or mental distress. Given the absence of such evidence, we find that Max failed to present sufficient evidence

---

[6] Having found that Max presented insufficient evidence that Parker engaged in a pattern of conduct against Amy, we need not address whether there was sufficient evidence that Parker knowingly caused Amy to believe that she will cause her physical harm or mental distress.

that Parker engaged in menacing by stalking against any of the Holloway's children. *Luikart*, 2003-Ohio-2130, at ¶ 11, citing *Spence v. Herbert*, 5th Dist. No. 00CA93 (July 30, 2001); *Griga*, 2012-Ohio-6097, at ¶ 22.

**{¶35}** In sum, we find that Max failed to present sufficient evidence that Parker engaged in menacing by stalking against him, Amy, or any of their children. While it appears that Parker's actions have created an uncomfortable situation, this court has observed that "R.C. 2903.211 and R.C. 2903.214 were not enacted for the purposes of alleviating uncomfortable situations, but to prevent the type of persistent and threatening harassment that leaves victims in constant fear of physical danger[,]" or mental distress. *Kramer*, 2002-Ohio-4383, at ¶ 17. Since this matter has no evidence of such a constant fear, we find that the trial court abused its discretion when it issued the CSPO.

**{¶36}** Accordingly, we sustain Parker's first, second, and third assignments of error.

*Assignments of Error Nos. IV, V, & VI*

**{¶37}** In her fourth, fifth, and sixth assignments of error, Parker contends that the issuance of the CSPO protecting Max, Amy, and their children was against the manifest weight of the evidence. Given our disposition of Parker's first three assignments of error, Parker's fourth, fifth, and sixth assignments of error are moot and we decline to address them. App.R. 12(A)(1)(c).

{¶38} Having found error prejudicial to Parker herein, in the particulars assigned and argued in her first, second, and third assignments of error, we reverse the trial court's judgment.

*Judgment Reversed*

**PRESTON, P.J. and WILLAMOWSKI, J., concur.**

**/jlr**